UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL JONES BENNETT,

               Petitioner,                       Case No. 13-CV-14996

v.                                      Honorable Patrick J. Duggan

CARMEN PALMER,

               Respondent.

_____/

**OPINION AND ORDER (1) DENYING THE PETITION FOR WRIT OF
HABEAS CORPUS, (2) GRANTING A CERTIFICATE OF
APPEALABILITY, AND
(3) GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

## I.  INTRODUCTION

Petitioner Carl Jones Bennett, a Michigan Department of Corrections prisoner currently confined at the Michigan Reformatory in Ionia, Michigan, filed a pro se amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on November 26, 2014.  In his amended petition, which is presently before the Court, Petitioner challenges his state-court convictions for:  first-degree murder, in violation of Michigan Compiled Laws § 750.316(1); assault with intent to commit murder, in violation of Michigan Compiled Laws § 750.83; assault with intent to commit great bodily harm less than murder, in violation of Michigan Compiled Laws § 750.84; felon in possession of a firearm, in violation of Michigan

Compiled Laws § 750.224f; and possession of a firearm during the commission of a felony (felony firearm), in violation of Michigan Compiled Laws § 750.227b. The amended petition seeks relief on the following ground:

> Trial counsel rendered ineffective assistance and further violated Petitioner's state and federal constitutional rights to a fair and impartial trier of facts where he failed to move to disqualify the judge who knew Petitioner was willing to plead guilty to second-degree murder from being the trier of fact at the bench trial in violation of US CONST AMS VI, XIV.

(ECF No. 11).

Respondent Carmen Palmer filed an answer to the amended petition, seeking denial of the application on the basis that Petitioner's claim lacks merit. Respondent also argues that the state court's rejection of Petitioner's claim was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Having thoroughly reviewed Petitioner's claim and the corresponding Rule 5 materials,[1] the Court concludes that Petitioner is not entitled to issuance of the writ. The Court will therefore deny Petitioner's application for the writ and dismiss the habeas corpus petition with prejudice. The Court nevertheless will issue a certificate of appealability and grant Petitioner permission to proceed *in forma pauperis* on appeal.

---

[1] Rule 5 of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254, specifically subdivisions (c) and (d), sets forth the respondent's obligation to submit state court materials related to the conviction and appeal challenged in any § 2254 proceeding.

## II.  BACKGROUND

### A.  The Charges and Trial Testimony

Petitioner was charged in Wayne County, Michigan with felony murder, first-degree premeditated murder, two counts of assault with intent to commit murder, felon in possession of a firearm, and felony firearm.  The charges arose from an incident that occurred in Detroit on May 13, 2011.  The incident involved Darryl Nails, Sr., his ten-year-old son Darryl Nails, Jr., his sister Lenora Nails, and his great niece Angel Nails, all of whom lived together on Hawthorne Street.  The Michigan Court of Appeals provided the following overview of the case:

> Defendant's convictions stem from an incident in which he lured a friend away from his home, leaving the women and child inside more vulnerable. Defendant and two accomplices then robbed the home, fatally shot his friend's sister, shot and severely injured his friend's 18-year-old niece, and chased and physically assaulted his friend's 10-year-old son.  The prize sought by defendant was a winning lottery ticket worth $2,700.

*People v. Bennett*, No. 307452, 2013 WL 967583, at *1 (Mich. Ct. App. Mar. 7, 2013), *appeal denied*, 495 Mich. 853, 835 N.W.2d 581 (2013).

Darryl Nails, Sr., testified that Petitioner called him two times on the night of the shooting and asked Mr. Nails to meet him at his sister's house for the purpose of giving him marijuana.  After the second call, Mr. Nails locked the house doors and left home to meet Petitioner.  Petitioner, however, was not at his sister's house.  Mr. Nails subsequently got a call from his niece Angel, urging him

3

to come home because the family had been robbed and hurt. When he arrived home, Angel was bleeding, and his sister was dead inside the house. He later learned that his son had been choked elsewhere, but that he was alright. A television and safe were missing from the house.          Mr. Nails stated that Petitioner had been at his house a week earlier when he (Mr. Nails) learned that he won a lottery ticket for $2,700 and put the ticket in a safe inside the house. (10/17/11 Trial Tr. 14-54.) Mr. Nails admitted that he received food stamps and that he would have been penalized for accepting $2,700. Consequently, he cashed the ticket at a supermarket for $2,200. (*Id*. at 41-43.) He denied knowing anything about the drugs found at his house. (*Id.* at 43-44.)

Eighteen-year-old Angel Nails testified that, on May 13, 2011, she was living with her great uncle Darryl Nails, her cousin Darryl Nails, and her grandmother Lenora Nails. All of them were at home on May 13, 2011, but her Uncle Darryl left the house late that night and locked the door. When she got up to get some water, she noticed two men on the porch trying to get in the house. One of the men was Petitioner, whom she knew by the nickname "Low." Petitioner told her grandmother that he needed to use their telephone because someone was after him. Petitioner was permitted to come inside the house. He had a gun in his hand, and the two men with him grabbed a television and the safe that were in her

4

great uncle's room.  The two men left the house, but her grandmother got upset and tried to hit the gunman with a car jack.

Continuing, Angel explained that, after the gunman cocked his gun, her grandmother and cousin ran into the bathroom.  She (Angel) coaxed them out of the bathroom after Petitioner promised not to hurt them.  But once her grandmother and cousin came out of the bathroom, Petitioner shot her grandmother in the stomach.  Petitioner then made her, her grandmother, and her cousin Darryl go in Darryl's bedroom.  Petitioner subsequently asked her to step into the living room to make sure that no one was coming.  While she was in the living room, she heard little Darryl cry, "Auntie, Auntie," and she heard a noise like something had fallen.  Then Petitioner approached her in the living room and shot her.  She held up her hand to protect her face, but Petitioner shot her a second time.  At that point, she pretended to be dead.  Petitioner then left the premises, and she called her Uncle Darryl to tell him what happened.  She also called the police.  The police subsequently showed her six photographs, and she identified Petitioner as the person who had shot her and her grandmother.  She claimed that she had seen him at her house on the day that her uncle won the lottery.  (*Id*. at 58-96.)

Ten-year-old Darryl Nails, Jr., described the incident as follows.  After his father  left the house on May 13, 2011, his aunt opened the back door.  Petitioner and two other men came inside the house.  Petitioner had a gun, and he told them

to get on the floor.  The other men went in his father's room, picked up the safe, and took it out the back door.  His aunt tried to hit the gunman with a tool, but Angel prevented his aunt from hitting the man, and then he and his aunt went into the bathroom.  Petitioner shot his aunt when she later opened the bathroom door. Then he, his aunt, and Petitioner went into his father's room while Angel went to the front door.  Petitioner said everything would be alright, but then shot his aunt in the head.  (*Id*. at 97-113.)

Darryl testified that Petitioner subsequently left the bedroom and went toward the front of the house where Angel had gone.  Darryl also proceeded toward the front of the house, but after he heard a sound like a silent gunshot, he ran out the back door and toward Eight Mile Road.  Petitioner chased him, caught him, and choked him.  He blacked out, and when he woke up, Petitioner was gone. Some ladies took him home.  A few days later, the police showed him some pictures, and he identified Petitioner as the man who shot his grandmother.  He had seen Petitioner at his house once before the day of the shooting and twice at his father's girlfriend's house.  (*Id.* at 115-142.)

Jennifer Williams testified that she saw someone wrestling with a little boy in the vicinity of I-75 and Eight Mile Road on May 13, 2011.  She stopped her car because the boy was screaming for help.  She called the police, and the man ran

away. The boy had passed out, but he woke up before the police came and told her that somebody had shot his aunt and cousin. (*Id*. at 143-49.)

Evidence technician Raymond Diaz collected five bullets, five casings, suspected heroin, and a phone at the crime scene. He found a razor blade and a white powdery substance on a ceramic plate in a dresser drawer in the victims' residence, and he found twelve packets of suspected heroin on the rear steps of the house. (*Id*. at 149-61; 10/18/11 Trial Tr. 4-15.)

No gun was admitted in evidence, but Shawn Kolonich testified that fired cartridge cases and fired bullets collected at the crime scene were consistent with a .22 caliber long or long rifle caliber. He explained that "long rifle caliber" is merely a caliber designation and that handguns can fire the caliber. He also testified that the five fired cartridge cases in evidence were fired from the same firearm. (10/18/11 Trial Tr. 15-39.)

Police Officer Ian Becker responded to the crime scene on May 13, 2011, and was told by two gentlemen named Darryl Nails, Sr. and Darryl Nails, Jr. that Petitioner had come in the house and shot two females. (*Id*. at 40-44.) Adrian Lawrence was the officer in charge of the case. He testified that he found a box of .22 caliber rounds and a wallet with Petitioner's identification in it on a table in the basement of the home where Petitioner was living at the time. Officer Lawrence

also conducted the photo lineups at which the younger Darryl Nails and Angel Nails identified Petitioner.  (*Id.* at 44-58.)

Petitioner did not testify or present any witnesses.  The parties stipulated, among other things, that: the cause of Lenora Nails' death was multiple gunshot wounds, and the manner of death was homicide (10/17/11 Trial Tr. 13); Petitioner was convicted of a prior felony and was ineligible to possess a firearm on May 13, 2011 (*id*. at 13-14); a one-page Internet printout from the Michigan Lottery website indicated that the winning four numbers on May 6, 2011 were 1-1-0-3 (10/18/11 Trial Tr. 3); and Defense Exhibit A was a notarized letter from the Bureau of State Lottery indicating that there was no record of paying a lottery prize to Darryl Nails, Sr. (10/17/11 Trial Tr. 57.)

### B.  The Trial Court's Decision, the Sentence, and the Direct Appeal

On October 18, 2011, the trial court found Petitioner guilty of felony murder, Michigan Compiled Laws § 750.316(1)(b), and premeditated murder, Michigan Compiled Laws § 750.316(1)(a), for the death of Lenora Nails.  The court also found Petitioner guilty of:  assault with intent to commit murder, Michigan Compiled Laws § 750.83, for the assault on Angel Nails; assault with intent to commit great bodily harm less than murder (as a lesser-included offense of assault with intent to commit murder), Michigan Compiled Laws § 750.84, for the assault on Darryl Nails, Jr.; possession of a firearm by a felon, Michigan

Compiled Laws § 750.224f; and felony firearm, Michigan Compiled Laws § 750.227b.  On November 9, 2011, the trial court sentenced Petitioner to two years in prison for the felony-firearm conviction, followed by concurrent terms of life imprisonment for the two murder convictions, thirty to sixty years for the assault-with-intent-to-commit-murder conviction, three to ten years for the other assault conviction, and one to five years for the felon-in-possession conviction.  (11/9/11 Sentence Hr'g Tr. 12.)

In an appeal as of right, Petitioner raised the same ineffective-assistance-of-counsel claim that he has presented to this Court.  He also claimed that, because there was only one decedent, the judgment of sentence should be corrected to reflect one conviction and one sentence for first-degree murder to avoid a double jeopardy violation.

On March 7, 2013, the Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, per curiam opinion, but remanded his case so that the trial court could amend the judgment of sentence to reflect a single first-degree murder conviction, supported by two theories, and a single first-degree murder sentence.  *People v. Bennett*, No. 307452 (Mich. Ct. App. Mar. 7, 2013).  The Michigan Supreme Court denied leave to appeal on September 3, 2013, because it was not persuaded to review Petitioner's claim about trial counsel.  *People v. Bennett*, 495 Mich. 853, 835 N.W.2d 581 (2013) (table).

9

### C.  The Initial Habeas Petition, Stay, and Amended Petition

On December 10, 2013, Petitioner commenced this action and raised his claim about trial counsel's failure to move to disqualify the trial court.  (ECF No. 1.)  On the same day, Petitioner moved to hold his petition in abeyance while he returned to state court and filed a motion for relief from judgment.  (ECF No. 2.)  The Court denied Petitioner's motion for a stay, but stated that Petitioner could move for a non-prejudicial dismissal of his habeas petition within thirty days of the Court's order.  (ECF No. 8.)  Petitioner then moved to dismiss his habeas petition without prejudice (ECF No. 9), and on April 17, 2014, the Court granted his motion (ECF No. 10).

Meanwhile, Petitioner wrote to the trial court and asked the court to suspend or modify the costs and fees imposed at sentencing.  On January 17, 2014, the trial court denied Petitioner's request in a letter stating that it was not authorized to modify or alter a valid sentence after the defendant began to serve his sentence, absent an error rendering the sentence invalid.  The court also stated that Petitioner had failed to show he would suffer actual hardship if he were required to pay the fees and court costs.

Petitioner appealed the trial court's decision, but the Michigan Court of Appeals dismissed his appeal for lack of jurisdiction because the trial court's correspondence was not an order from which he could appeal.  The Court of

10

Appeals also stated that Petitioner could not appeal the judgment of conviction and sentence because he had previously taken an appeal from the judgment of conviction and sentence.  *See People v. Bennett*, No. 320863 (Mich. Ct. App. May 18, 2014).  Petitioner did not appeal the Court of Appeals decision.  (ECF No. 16-15).  Instead, he filed an amended petition for writ of habeas corpus, raising the same ineffective-assistance-of-counsel claim that he presented to the Court in his initial petition.  (ECF No. 11.)  The Court then re-opened this case and ordered Respondent to file an answer to the petition (ECF No. 13), and on July 21, 2015, Respondent filed her answer to the amended petition (ECF No. 15).

### III.  LEGAL STANDARD

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, the court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11

28 U.S.C. § 2254(d).   Section 2254(d) applies to Petitioner's claim because the state court adjudicated his claim on the merits on direct appeal.   *Cullen v. Pinholster*, 563 U.S. 170, __, 131 S. Ct. 1388, 1402 (2011).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000) (O'Connor, J., opinion of the Court for Part II).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable."   *Id*., 529 U.S. at 411, 120 S. Ct. at 1522.   "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 2066 n.7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam)."   *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S. Ct. at 786-87.

## IV. ANALYSIS

Petitioner alleges that his trial attorney was ineffective for failing to move to disqualify the trial judge as the trier of fact at his bench trial. Petitioner claims that the trial court knew he was willing to plead guilty to second-degree murder and there is a significant possibility that the court's decision on the charges was influenced by his willingness to plead guilty to a lesser charge. Petitioner also contends that the appearance of partiality was too high to be constitutionally tolerable.

The Michigan Court of Appeals adjudicated this claim on the merits and concluded that, "[b]ecause any motion by defense counsel to disqualify the trial judge for bias would have been futile, [Petitioner could not] establish that counsel was ineffective in failing to raise such a motion." *Bennett*, No. 307452, 2013 WL

967583, at *1.  In reaching this conclusion, the Court of Appeals pointed out that Petitioner was fully aware that the trial judge had presided over the plea negotiations.  The Court of Appeals also relied on the fact that Petitioner had presented no evidence of judicial bias and no evidence of the advice trial counsel gave him, such that he could overcome the strong presumption that counsel acted in a reasonably objective professional manner.  The Court of Appeals therefore declined to find that counsel's performance was constitutionally ineffective.

### A.  Clearly Established Federal Law

### 1.  Ineffective Assistance of Counsel

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), is clearly established federal law for purposes of Petitioner's ineffective-assistance-of-counsel claim.  *Pinholster*, 131 S. Ct. at 1403. Under *Strickland,* a defendant must show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*.

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.  "Judicial

14

scrutiny of counsel's performance must be highly deferential." *Id*. at 689, 104 S.

Ct. at 2065.

> A fair assessment of attorney performance requires that every effort
> be made to eliminate the distorting effects of hindsight, to reconstruct
> the circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.   Because of the
> difficulties inherent in making the evaluation, a court must indulge a
> strong presumption that counsel's conduct falls within the wide range
> of reasonable professional assistance; that is, the defendant must
> overcome the presumption that, under the circumstances, the
> challenged action "might be considered sound trial strategy."   There
> are countless ways to provide effective assistance in any given case.
> Even the best criminal defense attorneys would not defend a particular
> client in the same way.

*Id*. (internal citation omitted).

To demonstrate that counsel's performance prejudiced the defense,

Petitioner must show "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id*. at 694, 104 S. Ct. at 2068.  "This does not require a showing that

counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood

of a different result must be substantial, not just conceivable." *Harrington*, 562

U.S. at 111-12, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

## 2.  Judicial Bias

In order to properly evaluate Petitioner's claim about trial counsel, the Court

looks to his underlying assertion that the trial court was a biased trier of fact.

"Judicial bias is a deep-seated favoritism or antagonism that makes fair judgment impossible." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 513 (2013). "[T]he Due Process Clause [of the Fourteenth Amendment to the United States Constitution] clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-905, 117 S. Ct. 1793, 1797 (1997) (internal and end citations omitted).

"Ordinarily, [courts] presume that public officials have properly discharged their official duties." *Id*. at 909, 117 S. Ct. at 1799 (quotation marks and citations omitted). And to prevail on a claim of judicial bias, a habeas petitioner must show "there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar v. Sarafite*, 376 U.S. 575, 588, 84 S. Ct. 841, 849 (1964).

## B. Application

At a pretrial conference in this case on September 16, 2011, the prosecutor placed a plea offer on the record. She stated that she could authorize a guilty plea to murder in the second degree and felony firearm with a sentence agreement of thirty to fifty years. The prosecutor explained that the sentencing guidelines for second-degree murder began at twenty-three years and went all the way to fifty-

four years.  The trial court then asked Petitioner whether he wanted another special pretrial conference to consider the offer.  Petitioner responded, "Not really.  What I was told, the numbers (sic) was lower than that, like at 25."   (9/16/11 Pretrial Tr. 4-5.)

The prosecutor then stated that the guidelines for second-degree murder could be as low as twenty-six years, three months, and could be as high as fifty-four years, because Petitioner was a habitual offender.[2]   The trial court subsequently explained to Petitioner that the lowest possible sentence under the guidelines was twenty-six years and that the prosecutor was offering him thirty years, but if he were convicted by a jury, the minimum sentence could be as high as fifty years.  The court then asked Petitioner whether he was interested in trying to negotiate something close to twenty-six years.   Petitioner responded, "Yes, ma'am."  The court then scheduled another pretrial conference.  (9/16/11 Pretrial Tr. 6-7.)

At a special pretrial conference on October 7, 2011, the parties indicated that the plea offer had been withdrawn because the victims' family opposed it.  The parties then met with the judge in chambers[3] and decided that one final special pretrial conference was warranted.  (10/7/11 Pretrial Tr. 3-6.)

---

[2]  Petitioner was twenty-four years old at the time.  (9/16/11 Pretrial Tr. 6.)

[3]  The discussion in chambers was not transcribed.

The final special pretrial conference occurred on October 13, 2011. Defense counsel stated that they had been hoping for a resolution of the case, but that there was no resolution at that point in time and that Petitioner wished to waive his right to a jury trial and have a bench trial before the court. Petitioner then waived his right to a jury trial and indicated that he wanted a trial with the court as the finder of fact. He denied being threatened or promised anything to make him choose the court, rather than a jury, as finder of fact, and he stated that he was making the request of his own free will. (10/13/11 Pretrial Tr. 3-4.) The trial commenced on October 17, 2011.

### 1. Deficient Performance

Petitioner alleges that his willingness to plead guilty to second-degree murder was an implied confession, which should have prompted the trial court to disqualify itself. According to Petitioner, the judge was aware of external factors that were material to his guilt and were not a part of the trial record. Petitioner contends that there is a significant possibility the trial court's decision to convict him was influenced by his willingness to plead guilty, as there is nothing more condemning than a defendant's own admission of guilt.

Petitioner, however, made no admissions of guilt at the pretrial conferences. Although he did imply that he would plead guilty to second-degree murder and felony firearm if he could negotiate a sentence of approximately twenty-five years,

18

a judge is not recusable for bias or prejudice as a result of what the judge learned in the course of the proceedings or earlier proceedings. *Liteky v. United States*, 510 U.S. 540, 551, 114 S. Ct. 1147, 1155 (1994); *see also United States v. Sammons*, 918 F.2d 592, 598-99 (6th Cir. 1990) (concluding that the trial judge's participation in the proceedings, including his participation in plea negotiations, did not support the defendant's demand for the judge's recusal).

Trial counsel, moreover, could reasonably have concluded that the trial court would be more sympathetic to Petitioner than another judge. The court scheduled three pretrial conferences so that Petitioner could consider the prosecutor's offer to have him plead guilty to second-degree murder, rather than go to trial on charges of first-degree murder and several other felonies. Given the trial court's apparent support of a plea agreement involving a plea of guilty to second-degree murder, defense counsel could have concluded that he might be able to persuade the court to find Petitioner guilty of second-degree murder rather than first-degree murder, which carries a penalty of life imprisonment without the possibility of parole. Michigan Compiled Laws § 750.316(1). In fact, defense counsel argued at trial that, at most, the prosecution had proved that Petitioner committed second-degree murder, felony fireman, and felon in possession of a firearm. (10/18/11 Trial Tr. 80.) The Court therefore concludes that trial counsel's failure to move to disqualify the trial court did not constitute deficient performance.

## 2. Prejudice

Petitioner also has failed to show that his counsel's allegedly deficient performance prejudiced the defense. To begin, the evidence against Petitioner was overwhelming. Angel Nails and Darryl Nails, Jr., recognized Petitioner and observed him fire his handgun. Both of them identified Petitioner in photo arrays before trial and again at trial. The lottery ticket provided a motive for the robbery, and a rational trier of fact could have concluded that Petitioner shot two of the victims and tried to choke the youngest victim to prevent them from identifying him. Furthermore, firearm evidence at the crime scene matched the caliber of bullets found at Petitioner's residence. Due to the strength of the evidence against Petitioner, there is not a substantial probability that the result of the trial would have been different if defense counsel had successfully disqualified the judge assigned to the case and proceeded to trial before a judge who knew nothing about the plea negotiations.

Not only was the evidence overwhelming, but there is no evidence that the trial court was actually biased against Petitioner. During the court's findings of fact and conclusions of law, the court stated that, given the arguments in the case, the issue was Petitioner's intent, not whether he killed one victim and assaulted the other victims with intent to murder them. (10/18/11 Trial Tr. 85-86.) The court considered the possibility that Petitioner was guilty of second-degree murder as a

result of a disagreement with the deceased victim, but concluded that, "It's just not there."   (10/18/11 Trial Tr. 86.)   The court found the eyewitnesses' pretrial statements to be consistent and their identification of Petitioner as the killer to be persuasive because they knew Petitioner.   The court was convinced beyond a reasonable doubt that the killing was conducted during a planned larceny and, therefore, Petitioner was guilty of felony murder.  (*Id.* at 87-89.)

The court also found Petitioner guilty of premeditated murder, because he shot Lenora Nails, then separated the victims, and shot Lenora two more times, the last time in the head.  The court stated that any fair and reasonable finder of fact would find nothing other than first-degree premeditated murder.  (*Id.* at 89-90.)

The trial court found Angel Nails' testimony to be "compelling and uncontroverted."  The court said that a reasonable finder of fact could find nothing other than assault with intent to murder Angel.  (*Id.* at 90-91.)  As for the charge involving ten-year-old Darryl Nails, the court said:  "[I]n being as fair to the law as an unemotional finder of fact that the Court is required to be, I would find the defendant guilty of [the lesser-included offense] of assault with intent to do great bodily harm."  (*Id.* at 91.)  The court also found Petitioner guilty of felony firearm and being a felon in possession of a firearm.  (*Id.*)

To summarize, there is no evidence that the trial court was actually biased against Petitioner.  In addition, the evidence against Petitioner was overwhelming,

and trial counsel could have reasonably concluded that the trial court would be willing to find Petitioner guilty of a lesser-included offense.  Consequently, trial counsel's failure to move to disqualify the trial court did not constitute deficient performance, and the allegedly deficient performance did not prejudice Petitioner. Petitioner therefore has no right to habeas corpus relief on his claim of ineffective assistance of counsel.

## V.  CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).

While the Court continues to believe that Petitioner is not entitled to a writ of habeas corpus for the reasons set forth above, the Court concludes that reasonable jurists could debate the correctness of the Court's assessment of Petitioner's claim.    Accordingly, a certificate of appealability shall issue.

22

Moreover, because an appeal could be taken in good faith, Petitioner may proceed *in forma pauperis* on appeal.  28 U.S.C. § 1915(a)(3).

## VI.  CONCLUSION

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to the relief he seeks.  With respect to his only claim, the state appellate court's adjudication of the claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent. Because Petitioner has not demonstrated that he is being held in violation of his constitutional rights, he is not entitled to the issuance of the writ of habeas corpus.

Accordingly,

**IT IS ORDERED** that the amended Petition for Writ of Habeas Corpus (ECF No. 11) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability **SHALL ISSUE** and Petitioner may proceed *in forma pauperis* in the appellate court.


Dated: September 21, 2015

                              s/PATRICK J. DUGGAN
                              UNITED STATES DISTRICT JUDGE

Copies to:
Carl Jones Bennett

Laura Moody, A.A.G.
Andrea M. Christensen-Brown, A.A.G.

23